Toomey, J.
PROCEDURAL CONTEXT
On February 7, 1991, plaintiffs filed a complaint asserting generally that defendant’s foreclosure upon plaintiffs’ home was tortious and in violation of contract. More particularly, the complaint alleged:
Count I — Breach of Contract
Count II — Fraud
Count III — Intentional Infliction of Emotional Distress Upon Plaintiff George Stone
Count IV — Intentional Infliction of Emotional Distress Upon Plaintiff Kathy Stone
Count V — Negligent Infliction of Emotional Distress Upon Plaintiff George Stone
Count VI — Negligent Infliction of Emotional Distress Upon Plaintiff Kathy Stone
Plaintiffs sought both injunctive relief and money damages in compensation for defendant’s alleged conduct. [1]
The complaint was tried, jury-waived, and, at the close of plaintiffs’ case, defendant moved, pursuant to Mass.R.Civ.P. 41(b)(2), to dismiss all counts for the *301 reason that plaintiffs had shown no right to relief. Because there was no credible evidence which, by a fair preponderance, suggested that defendant had intentionally or negligently inflicted emotional distress upon either plaintiff, the motion was allowed as to Counts III, IV, V and VI. Plaintiffs having adduced sufficient evidence, however, that defendant had breached a contract and made intentional misrepresentations of material fact resulting in injuiy to plaintiffs, the motion to dismiss was denied as to Counts I and II. Upon completion of the evidence, the matter was taken under advisement by the Court.
FINDINGS OF FACT
Based upon the evidence received at trial, this Court finds, by a fair preponderance of the proof, that:
1. On or about June 21, 1990, defendant, through its agent, Attorney Russell Chernin, corresponded with plaintiffs, informing them that, because plaintiffs were in default of a $60,000.00 promissory note, secured by a second mortgage in favor of defendant upon plaintiffs’ home, defendant intended to foreclose said second mortgage.[2]
2. On November 30, 1990, the defendant, through Attorney Chernin, corresponded with counsel for plaintiffs, informing them that “WCIS requires that Mr. Stone immediately bring the [$60,000.00] note current (interest only) and stay current . . . that this note be paid in full within the next six months . . . [and] that WCIS will not renew or extend the $60,000.00 obligation beyond 31 May 1990.” The interest then due on the $60,000.00 note was approximately $1,270.00.
3. On December 4, 1990, the Worcester Superior Court entered judgment authorizing defendant to foreclose and sell the property securing the plaintiffs’ obligation to defendant. Attorney Chernin was given notice of the judgment.
4. On December 9, 1990, counsel for plaintiffs received a check in consequence of plaintiffs’ sale of certain personal property. The check was in the amount of $12,800.00 and was made payable jointly to counsel and plaintiffs. In reliance upon the November 30, 1990, communication from defendant, plaintiffs intended that the check should be used to bring the note current and thus forestall foreclosure. Plaintiffs so instructed counsel.
5. On or about December 10, 1990, counsel for plaintiffs spoke with defendant, through Attorney Chernin, and informed defendant that counsel for plaintiffs “would be forwarding the check (received upon the sale of personal property belonging to plaintiff) or my check to [defendant] in response to this [November 30, 1990] letter ... I told Mr. Chernin that I thought that we would be forwarding the check as soon as I had my client come in and sign it.” In sum, plaintiffs’ counsel had “conversation with Mr. Chernin . . . that [he was] sending the $12,855.23 check in satisfaction of the November 30th, 1990, proposal.” 6. Counsel for plaintiffs diligently sought to contact plaintiffs with respect to his receipt of the $12,855.23 check and his intent to transfer it to defendant. He finally reached plaintiffs on or about December 17, 1990, and the necessary endorsements of the $12,800.00 check were obtained between Christmas and New Year’s Eve.
7. Immediately thereafter, counsel for plain tiff again spoke with defendant, through Attorney Chernin, and informed defendant that “. . . my client had finally come in to sign the check and that I’d be sending it along.” Attorney Chernin responded, “That’s fine, go ahead . . . send it along ...”
8. On January 4, 1991, counsel for plaintiff corresponded with defendant, through Attorney Chernin. The correspondence expressly alluded to “our conversation” and referenced the “outstanding loan” obligation of plaintiffs to defendant under “WCIS Account #993600.” The letter enclosed a check drawn by plaintiffs’ counsel and payable to defendant in the amount of $12,855.23. The defendant received and negotiated the check, applying $8800.00 to an outstanding loan (for a truck) as to which plaintiffs were obligated and the balance of the check to the principal of the $60,000.00 obligation.
9. The WCIS account to which counsel for plaintiffs alluded in his January 4, 1991 letter to Attorney Chernin was the $60,000.00 loan to plaintiffs and the guaranty running from plaintiffs to defendant.
10. In early February, 1991, defendant gave notice to plaintiffs of defendant’s intent to foreclose on the second mortgage securing plaintiffs’ $60,000.00 loan obligation to defendant.
11. On February 13, 1991, defendant, through Attorney Chernin, wrote to counsel for plaintiffs, conceding that its November 30, 1990, letter had constituted an “offer” to extend the maturity date of the $60,000 note, but asserting that the offer was acceptable only by plaintiffs’ “immediate” tender of the payment suggested in the said letter, to wit, “bring the note current (interest only) and stay current.” Defendant viewed the January 4, 1991 payment by plaintiffs as not sufficiently “immediate” to constitute an acceptance binding on defendant.
12. Between January 4, 1991, and February 19, 1991, James Millar, the father of plaintiff Kathy Stone, offered to provide her with funds to satisfy both the principal and interest of the $60,000.00 obligation. Kathy declined her father’s offer, assuming that foreclosure had been avoided by the January 4, 1991, payment.
13. On February 19, 1991, defendant, by foreclosure deed, conveyed the property to itself in consideration of $65,000.00.
14. Although the 1989 real property taxes on the premises had been paid in full, there was an amount in arrears on the 1990 tax obligation. There was no *302 evidence that plaintiffs or their counsel were aware of the arrearage or that the defendant’s foreclosure actions were premised upon that arrearage.
15. On February 25, 1991, the Worcester Superior Court entered an “Order Approving Sale and Entry” of the property. Attorney Chernin was given notice of the Order.
16. On May 15, 1991, plaintiffs were granted a judgment of divorce nisi with absolute date of August 14, 1991. They had been separated since May, 1989.
17. On June 19, 1991, plaintiff Kathy Stone received, from defendant through Attorney Chernin, a notice to vacate the premises as to which defendant had acquired title by foreclosure deed on February 19, 1991.
18. On July 8, 1991, the Housing Court, Worcester County Division, issued notice to plaintiff Kathy Stone of the request of defendant, through Attorney Chernin, that plaintiff be evicted from said premises. Eviction followed shortly thereafter.
19. The value of the property at the time of foreclosure was $214,000.00. Defendant held a $126,492.44 first mortgage and a $60,000 second mortgage on the property. There was a 1990 tax arrearage on the property of $2,054.00.
DISCUSSION
COUNT I. THE CONTRACT CLAIM
The November 30, 1990, letter from defendant to plaintiffs and the several conversations between defendant’s agent and plaintiffs’ counsel through December, 1990, constituted an offer by defendant to forbear its pursuit of foreclosure in return for plaintiffs’ payment of the interest then due on the $60,000.00 note and payment of the principal “on or before May 31, 1990 [sic].” Because plaintiffs’ payment in accordance with defendant’s offer would not constitute adequate consideration for the formation of a contract — the payment or the promise to pay that which plaintiffs were already obligated to pay not being “consideration” — there was no contract created either by the oral exchanges between the parties or by the actual delivery, on January 4, 1991, of the $12,855.23 check from plaintiffs to defendant.[3]
The conclusion that no contract was thus established does not, however, end the analysis of the claim. Indeed, a contract did arise by reason of the post-January 4 actions of defendant. The delivery of the check to defendant, in an amount inclusive of $1,270.00 in interest arrearage and of $11,585.23 in additional funds of unspecified allocation, constituted a counteroffer by plaintiffs to defendant through which plaintiffs sought defendant’s forbearance to foreclose. Although defendant did not expressly accept plaintiffs’ counteroffer, defendant’s act of negotiating the entirety of the check, presented to it for the plain purpose of avoiding the threatened foreclosure, was, in effect, am acceptance of the counteroffer and a promise to do that which the counteroffer sought, vis, the forbearance to foreclose.
One might wonder why, if defendant’s offer sought only interest currency in return for forbearance, plaintiffs would counter with an offer of interest currency and more in return for forbearance. The motive or rationale for the counteroffer is, of course, immaterial; it is enough if the counteroffer, for whatever reason, is in fact made. Here, however, we may speculate, but not without some logical force, that plaintiffs recognized that a promise to forbear would not obligate defendant if the consideration for the promise were inadequate. Accordingly, plaintiffs “sweetened the pot” with the counteroffer, proposing that interest currency plus an earlier-than-due reduction in principal be delivered in return for defendant’s forbearance. Defendant, by its receipt and negotiation of the January 4, 1991, check, accepted the counteroffer and gave birth to the contract.
Defendant’s subsequent pursuit of foreclosure constituted a breach of its contract not to foreclose[4] and, consequently, defendant is liable to plaintiffs for their losses occasioned by the breach. Judgment shall enter for plaintiffs on Count I.
II. THE MISREPRESENTATION CLAIM
In order to prevail upon a misrepresentation claim, plaintiffs must prove, by a fair preponderance of the credible evidence, that defendant made a false statement of material fact, knowing that plaintiffs would rely on the statement, and either knowing that the statement was false or negligently omitting to ascertain its truth. Additionally, plaintiffs must establish, again by a fair preponderance, that they did in fact rely upon the statement, that their reliance was reasonable and that their reliance resulted in some financial loss to them. At bar, plaintiffs have borne their burden.
Defendant’s November 30, 1990, letter and subsequent exchanges with plaintiffs’ representatives constituted a statement of material fact, to wit, the defendant would desist from foreclosure in return for plaintiffs’ making certain payments. That that statement of fact was material is demonstrated by its tendency to induce payment by plaintiffs to preserve their property interest. That it was known by defendant to be false is evidenced by the December 4, 1990, judgment authorizing foreclosure, a judgment procured just one business day after the November 30, 1990, letter was drafted and prior to the several conversations between defendant and plaintiffs’ counsel refining the defendant’s assertion of its willingness to forbear.[5]
That defendant knew of plaintiffs’ likely reliance on its statement and that plaintiffs did in fact so rely are amply established by the evidence received at trial. The several calls to Attorney Chernin by plaintiffs’ counsel during December, 1990, with reference to the proceeds soon to be received and delivered by plaintiffs in satisfaction of defendant’s demands, demonstrate *303 defendant’s knowledge of the impact on plaintiffs of its statements. The January 4, 1991, letter covering plaintiffs’ payment is persuasive that plaintiffs indeed did rely upon defendant’s statement of forbearance in their determination to make the payment. The circumstances described by the evidence fully warrant this Court’s conclusion that plaintiffs’ reliance was reasonable.
It is beyond cavil that plaintiffs have suffered financial loss as a consequence of their reliance. Had defendant been truthful with respect to its determination to foreclose, plaintiffs would not have delivered the $12,855.23 payment to defendant. Indeed, had plaintiffs realized defendant’s resolve to foreclose, they would not have rejected the “bail out” funds made available to them by Mr. Millar and have delivered those funds to defendant in full satisfaction — principal and interest — of the $60,000.00 obligation. On the other hand, had defendant remained faithful to its statement of its willingness to forbear, plaintiffs would have escaped foreclosure and retained their property interest, subject, of course, to the first and second mortgages held by defendant. In sum, the misrepresentation by defendant, whether intentional or negligent, resulted in financial loss to plaintiffs, and they shall, accordingly, have judgment on Count II.
III. DAMAGES
Defendant’s breach of contract and misrepresentation caused plaintiffs to lose their interest in the property securing the notes. Whether taken together or separately, defendant’s liability in contract and tort entitles plaintiffs to recover damages. The measure of damages is the value of the property plaintiffs lost as a result of defendant’s conduct.
The value of the property at the time of the breach/misrepresentation was $214,000.00. Plaintiffs owed defendant $126,492.44 on a first mortgage note and $60,000.00 on a second mortgage note. Plaintiffs’ interest in the property was also diminished by their 1990 tax liability of $2,054.00. On the other hand, because plaintiffs’ payment of $12,855.23 was induced by defendant’s misrepresentation and was delivered in anticipation of defendant’s adherence to the contract, the plaintiffs’ obligation to defendant should be reduced by the amount of that payment.
Damages shall be calculated, therefore, as follows:
(value of property) (first mortgage) (second mortgage) (1990 tax arrearage) (January 4, 1991, payment) $214,000.00 -$126,492.44 $87,507.56 -$60,000.00 $27,507.56 -$2,054.00 $25,453.56 +$12,855.23 $38,308.79
CONCLUSION
Judgment shall issue for plaintiffs upon Counts I and II in the amount of $38,308.79 plus statutory interest from February 7, 1991.

On February 13, 1991, this Court (Donohue, J.) denied plaintiffs’ request for a preliminary injunction against the then pending foreclosure sale by defendants. Because that sale has been consummated, the permanent injunctive relief sought by plaintiffs’ Counts I and II cannot be realized. Accordingly, the trial focused only upon the non-equitable judgment demanded by plaintiffs.

Defendant also held a first mortgage upon plaintiffs’ home, in the amount of approximately $127,000.00, but the obligation secured thereby was not in default.

This Court does not consider the voluntary payment by plaintiffs of an amount in excess of that sought by the offer, to wit, the $1,270.00 in interest arrearages, as constituting consideration sufficient to create a contract because, insofar as the offer was limited, there was no “meeting of the minds” between the parties as to the parameters of any agreement with respect to the excess payment.
On a related point, this Court need not address the timeliness of the January 4, 1991, payment. Plaintiffs’ satisfaction, uel non, of the “immediately” condition contained in defendant’s offer is rendered immaterial by this Court’s conclusion that no contract arose from the communications between the parties and the delivery of the January 4 payment.

Whether or not plaintiffs’ tax insufficiencies provided a ground for foreclosure distinct from the interest arrearage is immaterial. Defendant became contractually obliged not to foreclose for any pre-existing reason when it accepted and negotiated plaintiffs’ $12,855.23 check.

Although there is no evidence that Attorney Chemin knew that the defendant intended to proceed with foreclosure despite his November 30, 1990, letter and attendant conversations with plaintiffs’ counsel, his several communications were effected without his engaging the amount of care a reasonable person, similarly situated, would have employed to ascertain the truth of defendant’s willingness to forbear. Thus, plaintiffs were confronted with statements that were, at best, negligent and, at worst, intentionally fraudulent.